UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

INTERNATIONAL SALES GROUP, LLC and
J.O.S. REALTY CO.
d/b/a TIR SALES AND MARKETING,

      Plaintiffs,

vs.

MCZ / CENTRUM FLORIDA III OWNER, LLC
and MCZ / CENTRUM FLORIDA XVIII, LLC,

      Defendants.

_____/



CIV - KING

MAGISTRATE JUDGE
GARBER

### NOTICE OF REMOVAL

Defendant MCZ / Centrum Florida XVIII ("MCZ")[1] hereby files this Notice of Removal

of the above-captioned cause from the Circuit Court for the Eleventh Judicial Circuit, in and for

Miami-Dade County, Florida, to the United States District Court for the Southern District of

Florida, and states:

      1.      On or about August 23, 2006, plaintiffs, International Sales Group, LLC ("ISG")

and J.O.S. Realty Co. d/b/a Tir Sales and Marketing ("TIR"), filed a complaint in the Circuit

Court for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, bearing Case No.

06-17004-CA-11.

      2.      In compliance with 28 U.S.C. § 1446(a), attached as composite Exhibit A is a

copy of the Summons, the Complaint, and a Notice of Hearing, which constitute all "process,

pleadings, and orders" served upon defendant, as well as defendant's pending Motion to Dismiss



---

[1] MCZ / Centrum Florida XVIII is the successor by merger to MCZ / Centrum Florida III Owner.

Case 1:06-cv-22438-JLK   Document 1   Entered on FLSD Docket 09/28/2006   Page 2 of 41
International Sales Group, LLC et al. v. MCZ/Centrum Florida III Owner et al.
Notice of Removal

the Complaint.  Pursuant to S.D. Fla. L.R. 7.2, defendant shall file with this court a memorandum

of law in support of its pending Motion to Dismiss within 10 days.

3.      The Complaint was served on MCZ on August 28, 2006.  This Notice of Removal

is being filed within thirty days of defendant's receipt of a copy of the initial pleading.

Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C § 1446(b).  There has

been no waiver by MCZ of any right to remove this cause to this Court.

4.      Plaintiff ISG is a Florida limited liability company with its principal place of

business in Miami-Dade County, Florida.  Plaintiff TIR is a Florida corporation with its principal

place of business in Miami-Dade County, Florida.  *See* Compl. at ¶ 2.

5.      MCZ is a foreign corporation, incorporated under the laws of a state other than

the State of Florida and with its principal place of business outside of Florida.

6.      Civil cases filed in state court may be removed to federal district court if the case

could have been brought originally in federal district court and, where not founded on a claim or

right arising under the Constitution, treaties, or laws of the United States, none of the defendants

properly joined and served is a citizen of the State in which the action is commenced.  *See* 28

U.S.C. § 1441(a)-(b).  The federal district courts have original jurisdiction over all civil actions

in which the matter in controversy exceeds $75,000 and is between citizens of different states.

*See* 28 U.S.C. § 1332(a).  Here, the allegations of the complaint establish that the amount in

controversy far exceeds $75,000.  *See, e.g.*, Compl. at ¶¶ 4, 6, 15, 18, and Exh. 1 ("Brokerage

Agreement") at 18 ("Exhibit 'E': Broker's Commission Schedule)  (Plaintiffs claim that their

actions pursuant to an agreement resulted in defendant's receipt of a "sum in excess of $190,000

million [*sic*]"; allege that the commission due is at minimum 2.75% of this amount; and seek

"monies due and owing under the terms of the agreement."   Even if the amount allegedly

2

Case 1:06-cv-22438-JLK   Document 1   Entered on FLSD Docket 09/28/2006   Page 3 of 41
International Sales Group, LLC et al. v. MCZ/Centrum Florida III Owner et al.
Notice of Removal

received by the defendant as a result of plaintiffs' actions is read to be $190 million, applying the alleged commission rate yields an amount claimed of some $5.23 million.)  As noted in ¶¶ 4-5, *supra*, defendant is not a citizen of Florida and there is complete diversity of citizenship.

7.     Removal is to the United States District Court for the Southern District of Florida because this cause is pending in the Circuit Court for Miami-Dade County, Florida.  *See* 28 U.S.C. §1441(a).

8.     The allegations set forth in this Notice of Removal are true and correct to the best of the knowledge and belief of the undersigned attorney based upon his review of the Complaint.

9.     In compliance with 28 U.S.C. § 1446(d), written notice of the filing of this Notice of Removal will be filed promptly in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, and served on all parties.

WHEREFORE, defendant MCZ / Centrum Florida XVIII requests that the above action now pending against it in the Circuit Court in and for Miami-Dade County, Florida, be removed therefrom to this Court.

Dated:  September 27, 2006.

Respectfully submitted,

HOLLAND & KNIGHT LLP
*Attorneys for MCZ / Centrum Florida XVIII*
701 Brickell Avenue, Suite 3000
Miami, Florida 33130
Telephone: (305) 374-8500
Fax:  (305) 789-7799

By: _____
       James. D. Wing
       Florida Bar No. 195537
       james.wing@hklaw.com
       Robert T. Watson
       Florida Bar No. 679429
       robert.watson@hklaw.com

Case 1:06-cv-22438-JLK Document 1 Entered on FLSD Docket 09/28/2006 Page 4 of 41
International Sales Group, LLC et al. v. MCZ/Centrum Florida III Owner et al.
Notice of Removal

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been served by facsimile (without exhibit) and by U.S. mail this 27th day of September 2006 upon Harris J. Buchbinder, Esq., Buchbinder & Elegant, P.A., Attorneys for Plaintiffs, 46 S.W. First St., Fourth Floor, Miami, FL 33130.

Robert T. Watson

# 4072215_v1

4

# Exhibit A

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

CASE NO. 06-17004 CA-11

INTERNATIONAL SALES GROUP, LLC,
etc., et al.

     Plaintiffs,

vs.

MCZ / CENTRUM FLORIDA III OWNERS,       **NOTICE OF HEARING**
LLC, etc., et al.                               (Motion Calendar)

     Defendants.

_____/

     PLEASE TAKE NOTICE that the undersigned will call up for hearing, before the **ROBERT SCOLA, JR.**, Circuit Court Judge, in Chambers, at the Miami-Dade County Courthouse, 73 West Flagler Street, Miami, FL 33130, on **Tuesday, the 3rd day of October, 2006, at 9:30 a.m.**, the following:

               **"MCZ/ Centrum Florida XVIII's Motion to Dismiss Complaint"**
                      dated September 18, 2006

               PLEASE BE GOVERNED ACCORDINGLY.

     IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing has been furnished, via facsimile transmission and U.S. mail, to James D. Wing, Esq. and Robert T. Watson, Esq., Holland & Knight, LLP, Suite 3000, 701 Brickell Avenue, Miami, FL 33131, this 22nd day of September, 2006.

                        BUCHBINDER & ELEGANT, P.A.
                        Attorneys for Plaintiffs
                        4th Floor
                        46 SW First Street
                        Miami, FL 33130
                        Telephone:    305/358-1515
                        Facsimile:     305/358-5202

                        By: _E. Philip Elegant_
                           HARRIS J. BUCHBINDER
                           Fla. Bar No. 009888

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 06-17004 CA 11

INTERNATIONAL SALES GROUP, LLC and
J.O.S. REALTY CO.
d/b/a TIR SALES AND MARKETING,

     Plaintiffs,

vs.

MCZ / CENTRUM FLORIDA III OWNER, LLC
and MCZ / CENTRUM FLORIDA XVIII, LLC,

     Defendants.

_____/

**THE ORIGINAL
FILED ON:**

**SEP 1 9 2006**

**IN THE OFFICE OF
CIRCUIT COURT DADE CO. FL.**

## MCZ / CENTRUM FLORIDA XVIII'S MOTION TO DISMISS COMPLAINT

Defendant MCZ / Centrum Florida XVIII ("MCZ")[1], by and through its undersigned counsel and pursuant to Rule 1.140(b), Florida Rules of Civil Procedure, moves the Court to dismiss counts I, II, and III of plaintiffs' Complaint for failure to state a cause of action. The grounds on which this motion is based and the substantial matters of law to be argued are:

    1.    Counts I and II fail to state a cause of action because it affirmatively appears from the face of the Complaint that the cause of action in both is barred by Florida Statutes Section 725.01, the Statute of Frauds.

    2.    Count III fails to state a cause of action because it fails to sufficiently allege the elements of the action for quantum meruit.

---

[1] MCZ / Centrum Florida XVIII is the successor by merger to MCZ / Centrum Florida III Owner.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing motion to dismiss was served via U.S. Mail upon Harris J. Buchbinder, Esq., Buchbinder & Elegant, P.A., 46 S.W. First Street, Fourth Floor, Miami, Florida 33130 on this 18th day of September, 2006.

HOLLAND & KNIGHT LLP
Counsel for Defendant
701 Brickell Avenue, Suite 3000
Miami, Florida  33131
Telephone:  (305) 374-8500
Facsimile:  (305) 789-7799

By:_____
         James D. Wing, Esq.
         Fla. Bar No. 195537
         Robert T. Watson
         Fla. Bar No. 0679429

# 4054032_v1

2

IN THE CIRCUIT COURT OF THE
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

INTERNATIONAL SALES GROUP, LLC,
A Florida limited liability company; J.O.S.
REALTY CO., a Florida corporation d/b/a
TIR SALES AND MARKETING,

        Plaintiffs,

vs.

MCZ / CENTRUM FLORIDA III OWNER,
LLC, a foreign limited liability company
and MCZ / CENTRUM FLORIDA XVIII,
LLC, a Delaware limited liability company,

        Defendants.

_____/

CASE NO.   06   17004   CA 11

**CIVIL ACTION SUMMONS**

THE STATE OF FLORIDA:
To Each Sheriff of Said State:

        YOU ARE HEREBY COMMANDED to serve this summons and a copy of the Complaint in this
action on Defendant:        **MCZ / CENTRUM FLORIDA XVIII, L.L.C.**
by service on its Registered Agent:      Corporation Service Company
                              1201 Hays Street
                              Tallahassee, FL 32301-2525

Each Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney, to wit:

                        **HARRIS J. BUCHBINDER, ESQ.**
                        **BUCHBINDER & ELEGANT, P.A.**
whose address is:             46 Southwest First Street, 4th Floor
                        Miami, Florida 33130
                        Telephone: (305) 358-1515
                        Facsimile: (305) 358-5202

within twenty (20) days after service of this summons on that Defendant, exclusive of the day of service, and
to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or
immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the
relief demanded in the Complaint.

DATED ON AUGUST ____, 2006.

AUG 23 2006

                        HARVEY RUVIN
                        as Clerk of said Court

                        GEORGINA TAYLOR

            By:_____
                        Deputy Clerk

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

CASE NO.        06  17004  CA13

INTERNATIONAL SALES GROUP, LLC,
A Florida limited liability company; J.O.S.
REALTY CO., a Florida corporation d/b/a
TIR SALES AND MARKETING,

       Plaintiffs,

vs.

MCZ / CENTRUM FLORIDA III OWNER,
LLC, an Illinois limited liability company
and MCZ / CENTRUM FLORIDA XVIII,
LLC, a Delaware limited liability company,

       Defendants.

_____/

## COMPLAINT

Plaintiffs, INTERNATIONAL SALES GROUP, LLC, a Florida limited liability company

("ISG") and J.O.S. REALTY CO., a Florida corporation d/b/a TIR SALES AND MARKETING

("TIR"), sue Defendants, MCZ / CENTRUM FLORIDA III OWNERS, LLC, an Illinois limited

liability company and MCZ / CENTRUM FLORIDA XVIII, LLC, a Delaware limited liability

company, and allege:

## GENERAL ALLEGATIONS

1.      This is an action for damages where the amount in controversy exceeds $15,000.00,

exclusive of interest, costs and attorneys' fees.

2.      At all times material hereto, Plaintiff, ISG, is and was a Florida limited liability

company, and Plaintiff, TIR, is and was a Florida corporation. Both Plaintiffs have their principal

place of business located in Miami-Dade County, Florida and are engaged in organizing and marketing sales programs for residential condominium properties.

3.    At all times material hereto Defendants, MCZ / CENTRUM OWNERS FLORIDA III, LLC ("MCZ III") and MCZ / CENTRUM FLORIDA XVIII, LLC ("MCZ XVIII"), are and were owners and developers of residential condominium developments and part of a group of business entities engaged in developing and selling residential condominiums. Defendant, MCZ III owned and developed a 530 unit project known as Sian. MCZ XVIII owned and developed a 351 unit project known as Parc Central. Said properties are located in Miami-Dade and Broward Counties.

4.    In the summer of 2005, Defendants' representatives conferred with Plaintiffs for the purpose of inducing Plaintiffs to perform certain consulting and marketing services for Defendants. Several proposed agreements were drafted and Plaintiffs executed a "Brokerage Agreement" which was signed by Defendants' representatives on behalf of a non-existing entity i.e., MCZ / CENTRUM OWNERS FLORIDA III, LLC. A copy of the "Brokerage Agreement" is attached hereto as Exhibit "1."

5.    In reliance upon Defendants' representation that a binding written agreement was in existence with the owner and developer of Sian and that an oral agreement existed between Plaintiffs and the owner of Parc Central, Plaintiffs performed valuable services and incurred substantial expenses on behalf of the Defendants, which include, but are not limited to the following:

a.  Recruited, hired, trained, supervised and maintained on-site sales staffs at the sales center.

b.  Established and coordinated an effective procedure to register, qualify and for the follow-up of persons visiting or inquiring about units and for the referral of inquiries.

c.  Prepared budgets and revisions thereof.

2

d. Monitored consultants in connection with model residences and sales center design.

e. Advised in the preparation of all advertisements, brochures, news releases, literature, floor plans of the units and other written pictorial and audio promotional material.

f. Consulted with and cooperated with all public relations consultants and other consultants employed by Defendants.

g. Advised and consulted with Defendants regarding the sales price schedule for units and revisions thereof.

h. Familiarized outside brokers and sales persons with the projects.

i. Monitored the progress and sales activity of each project utilizing internet-based inventory management systems and provided Defendants with daily and weekly sales status reports.

j. Coordinated all aspects of the prospective sales.

k. Monitored the status of all pending sales and any contingencies.

l. Transmitted all necessary construction status updates to Defendants.

m. Delivered all required disclosure documents to buyers and otherwise complied in all respects with applicable State and local laws relating to real estate brokerage activities.

6. As a result of the foregoing actions by the Plaintiffs, Defendants realized a substantial benefit in that Plaintiffs sold 370 units at Sian and sold 156 units at Parc Central, from which the Defendants received an aggregate sum in excess of $190,000 million.

7. On February 16, 2006 Defendant, MCZ XVIII, sent a letter to Plaintiffs, a copy of which is attached hereto as Exhibit "2." The stated purpose of said letter was to notify Plaintiffs that effective immediately MCZ XVIII terminated Plaintiffs' brokerage services in connection with Parc Central. Plaintiffs were forced to immediately leave the premises and discontinue their services.

3

8.      On or about July 17, 2006 Plaintiffs received a letter from Defendant, MCZ XVIII, a copy of which is attached hereto as Exhibit "3," which was sent on behalf of MCZ III, a non-existing entity, as the owner of the property known as Sian. The stated purpose of said letter was to serve notice to Plaintiffs that the Brokerage Agreement (Exhibit "1" attached hereto) was terminated pursuant to Section 17.2 thereof effective August 16, 2006.

9.      Notwithstanding that the letter, Exhibit "3," provides that the "Brokerage Agreement" is terminated pursuant to Section 17.2 thereof which provides termination upon 30 days notice, Defendants forced Plaintiffs' personnel out from the premises of the Sian and thus interfered with Plaintiffs' ability to perform its services through August 16, 2006, thereby depriving Plaintiffs of additional revenues which they would earn during said period.

10.     All conditions precedent to the institution of this action have occurred, been performed or have been excused.

11.     As a result of the foregoing, Plaintiffs have retained the services of the undersigned attorneys and have agreed to pay them a reasonable fee.

## COUNT I

## BREACH OF CONTRACT SIAN

12.     Plaintiffs reallege the allegations contained in paragraphs 1-11 hereof.

13.     The Brokerage Agreement attached hereto as Exhibit "1," was intended by all parties to be a binding and enforceable agreement between Plaintiffs and Defendants hereto as owner of Sian.

14.     Defendants breached said agreement by forcing Plaintiffs representatives off the premises and depriving Plaintiffs of the opportunity to continue to perform their part of the

4

agreement until the agreement was terminated.

15.     Defendants further breached said agreement by failing and refusing to pay Plaintiffs all monies due and owing under the terms of the agreement.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, interest, costs and attorneys' fees.

## COUNT II

## BREACH OF CONTRACT PARC CENTRAL

16.     Plaintiffs reallege the allegations contained in paragraphs 1-11 hereof.

17.     In or about September 1, 2005, Plaintiffs and Defendants entered into an oral brokerage agreement for the sale of Defendants' units at Parc Central.  The essential terms and conditions of said agreement are those set forth in the Brokerage Agreement (Exhibit "1" attached hereto).  Defendants breached said agreement by terminating the agreement upon two hours notice, and thus depriving Plaintiffs of the opportunity to continue to perform their part of the agreement for an additional thirty days.

18.     Defendants further breached said agreement by failing and refusing to pay Plaintiffs all monies due and owing under the terms of the agreement.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, interest, costs and attorneys' fees.

## COUNT III

## QUANTUM MERUIT

19.     Plaintiffs reallege the allegations contained in paragraphs 1-11 hereof.

20.     Plaintiffs expended monies and performed valuable services which resulted in a

5

benefit for the Defendants for which Plaintiffs have not been paid.

21.     Defendants have failed and refused to fully pay for said services and benefits resulting in Defendants' unjust enrichment.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, interest, costs and attorneys' fees.

**COUNT IV**

**MISREPRESENTATIONS**

22.     Plaintiffs reallege the allegations contained in paragraphs 1-11 hereof.

23.     At all times material hereto, Defendants represented to Plaintiffs that the Brokerage Agreement (Exhibit "1" attached hereto) was a binding agreement executed by the owner of the property known as Sian and that a similar agreement existed between Plaintiffs and Defendants as to Parc Central.

24.     In reliance upon Defendants' representation that binding agreements existed between the Plaintiffs and the owner of Sian and between Plaintiffs and the owner of Parc Central, Plaintiffs expended monies and performed valuable services for which they were not fully paid.

25.     At the time said representations were made said representations were untrue in that MCZ III did not exist.  Said Defendants never intended to be bound by the terms of such agreements, but rather intended to obtain the benefit of Plaintiffs' expenditures and services and not to fully pay Plaintiffs therefor.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, interest, costs and attorneys' fees.

6

BUCHBINDER & ELEGANT, P.A.
Attorneys for Plaintiff
4th Floor
46 SW First Street
Miami, FL 33130
Telephone:     305/358-1515
Facsimile:     305/358-5202


By:_____
          HARRIS J. BUCHBINDER
          Florida Bar No. 009888

7

## BROKERAGE AGREEMENT
### (the "Agreement")

**THIS AGREEMENT** by and between **MCZ / CENTRUM OWNERS FLORIDA III, LLC,** a Florida Limited Liability Company, ("Owner") and **INTERNATIONAL SALES GROUP, LLC.,** a Florida Limited Liability Company ("ISG"), and **TIR SALES AND MARKETING** ("TIR"), (collectively "Broker")

      **A.**     Owner is the owner of that certain real property, on which property Owner intends to develop the conversion project (the "Project"), as more particularly described on <u>Exhibit "A"</u>.

      **B.**     Owner proposes to develop, market and sell residential condominium units (the "Units") in the Project.

      **C.**     Broker is a duly licensed Florida real estate broker with expertise in creating, organizing and executing, marketing and advertising sales programs for residential condominium properties.

      **D.**     Owner desires to engage Broker to perform the services (the "Services") as more particularly described in Exhibit "B", and Broker desires to be so engaged by Owner, as Owner's exclusive broker in connection with the sale of the Units, on the terms and conditions hereinafter set forth.

      **NOW, THEREFORE,** in consideration of Ten and no/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Broker hereby agree as follows:

1.  **Recitals.** The foregoing recitals are true and correct and are incorporated herein by this reference as if repeated at length.

2.  **Engagement of Broker.** Owner does hereby retain and engage Broker as its exclusive broker and sales agent, and as a consultant for marketing and related matters, with respect to the Units at the Project on the terms and conditions set forth in this Agreement. Broker does hereby accept such retention and agrees to perform the services, and to fulfill such functions, as are set forth in this Agreement. This Agreement does not cover brokerage services for any commercial space at the Project. Broker and Owner may enter into a separate agreement in connection with brokerage services for commercial space at the Project.

3.  **Sales Center.** Owner will provide a sales center (the "Sales Center") at or near the site of the Project, within <u>75</u> days of the Effective Date, and will adequately furnish and reasonably maintain same at Owner's sole cost and expense. Except as may be otherwise set forth herein, Broker agrees to maintain an adequate staff for the promotion and sale of the Units until such time as bona fide sales contracts are entered into for the sale of all Units. An adequate staff shall be deemed to include a minimum of one sales manager, three salespersons, one contract administrator, one assistant to the contract administrator, one full time receptionist and one part-time receptionist. Personnel shall be scheduled to provide sufficient coverage at the Sales Center. Between the time that sales contracts on all Units have been entered into and the completion of closings on sale of all Units, Broker shall be entitled to cut back on staffing, and shall only be required to maintain such staff as necessary to service buyer-related matters until the closings are completed. The Sales Center shall be open daily for business during normal and customary times, specifically: Monday through Friday from 10:00 A.M. – 6:00 P.M.; Weekends and Holidays from 10:00 A.M. – 6:00 P.M.; and at all time(s) necessary to reasonably accommodate a prospective Purchaser (defined below) who requires a special appointment due to particular

EXHIBIT

"1"

requirements. The Sales Center shall be closed on the following holidays: New Years Day, July 4th (Independence Day), Memorial Day, Labor Day, Thanksgiving Day, and Christmas Day and any other days approved by Owner. Without limitation of any of the foregoing, all of Broker's agents and/or employees working on the Project shall be met and approved by Owner, and Broker shall replace any particular agent(s) or employee(s) that Owner may request, in Owner's sole but reasonable discretion, to be removed from working on the Project. Notwithstanding Owner's obligations as set forth herein, Broker acknowledges that Broker shall be solely responsible for managing all Sales Center employees, including any support staff and sales agents, in a commercially reasonable manner.

3.1.   Costs and Payment of Sales Center.   In accord with the Approved Budget as hereinafter defined and provided for, Owner shall be responsible for the salaries and benefits of the non-commissioned, non-salesperson staff at the Sales Center, all costs associated with such salaries and benefits including payroll taxes and withholding ("Broker's Personnel Expenses") and for miscellaneous supply costs relating to the operation of the Sales Center ("Miscellaneous Supply Costs), in accordance with the Approved Budget, hereinafter described, and attached hereto as Exhibit "C". Notwithstanding anything to the contrary in paragraph 5 herein below, Broker will advance such expenses regarding the Sales Center and Owner shall reimburse Broker for such expenses. Payment after 10 days from the date of invoice shall incur and include interest rate of 10% per annum. In the event full payment, including interest, is not received within 30 days from the date of invoice, in addition to any other remedy provided for in this Agreement, Broker may suspend services, including operation and staffing of the Sales Center until overdue payment is received.

3.2.   Contract Administrator.   Notwithstanding anything to the contrary in Paragraph 3 above, Owner may elect to appoint, retain and/or manage the Contract Administrator for the Sales Office. If Owner does so elect, Owner shall provide thirty days Notice to Broker of same identifying the individual Owner intends to appoint as Contract Administrator and upon such appointment Owner shall be solely responsible for the duties, management and performance of such individual. Nothing here shall relieve Broker from its responsibility as to an Administrative Assistant.

3.3.   Sales personnel.   As more specifically set forth in Paragraph 7 herein below, Broker shall, as part of its Draw against Commissions (as hereinafter defined) pay draws against commissions to salespersons, the sales director and/or manager and any other non-administrative staff at the Sales Center. Such Draw is set forth in the Approved Budget attached hereto as Exhibit C. All Sales persons and directors shall be subject to the terms and conditions set forth on Broker's standard form agreement, as applicable. ISG agrees that it shall pay not less than 1.25% to the sales team at the Sales Center.

3.4.   Disbursement of Funds by Broker.   Broker shall allocate and disburse funds received from Owner pursuant to this paragraph and in accord with this Agreement

4.  Advertising.  All advertising, public relations and promotions of, or with respect to the Project shall be initiated and coordinated by Broker and Owner, but shall be subject to the final approval or disapproval of Owner. Owner shall have the sole right to determine the type, media and form of advertising, public relations and promotions which determination right shall be final and dispositive. Owner shall be responsible for all costs incurred by Broker in connection with all such advertising, public relations and promotions, and shall fund the same as part of the Approved Budget on a monthly basis. Notwithstanding Owner's discretion, all advertising and media shall contain Broker's logo and notice that marketing

and sales for the project is exclusively by Broker. Broker shall provide camera ready art and copy to Owner and/or Owner's agency responsible for preparation of said advertising, public relations and promotions. Although not required by this Agreement, in the event that Broker incurs or advances costs in connection with advertising, public relations and promotions, approved by Owner or as otherwise provided herein, Owner shall reimburse Broker for such advance in accord with the procedure, terms and conditions identified in Paragraph 3 hereinabove regarding the Sales Center.

5. **Approved Budget.** Based upon the information provided by Owner, Broker has prepared an initial projected sales and marketing budget attached hereto as Exhibit "C" ("Approved Budget") setting forth the type and estimated amount of expenses Owner will need to contract for and fund in connection with the sale of the Units, including, without limitation, the expenses relating to the Sales Center, expenses associated with the advertising, marketing and promotion of the Project and Units, and other expenses relating to the Project and as otherwise anticipated or desirable in connection with the Services to be performed pursuant to this Agreement. Owner acknowledges that Broker's ability to perform its services are conditioned upon Owner's full, proper and timely funding of the items identified in the Approved Budget. Owner understands that unless otherwise specifically provided for in this Agreement, Owner shall be responsible for contracting with and making payments directly to any and all service providers whose services or materials are identified on the Approved Budget. Broker may revise the Approved Budget from time to time as may be necessary to reflect changes in Broker's expenditure requirements in connection with the sales and marketing of the Units and Project provided, however, that such revised budget shall not constitute the "Approved Budget" unless Owner indicates its written approval (given at Owner's sole discretion, but not unreasonably withheld). The initial Approved Budget is attached hereto as Exhibit "C". The parties acknowledge that the Approved Budget is an estimate and that costs of items referred to therein may fluctuate on a monthly basis. Although not required by this Agreement, in the event that Broker incurs or advances costs in connection with Owner's advertising, public relations, promotions or items in the Approved Budget, Owner shall reimburse Broker for such advance in accord with the procedure, terms and conditions, identified in paragraph 3 hereinabove regarding the Sales Center.

6. **Sales Price.** Owner desires to sell each of the Units at the respective gross sales prices established for the Units as set forth in Exhibit "D" (the "Price List") attached hereto and made a part hereof, which Price List and Exhibit may be revised in writing by Owner or Broker from time to time, upon twenty-four (24) hours advance notice by delivering Owner or Broker a new schedule of list prices or a new form of the purchase and sale agreement contract for Units. Notwithstanding the foregoing, Broker shall present every bona fide offer to purchase a Unit to Owner and Owner agrees to accept a Sales Contract wherein the sales price on the contract for the Unit is at least as high as the specified sales price for the Unit as set forth on the then current Price List and which earnest money deposits are scheduled as agreed between Broker and Owner and the sales price is to be paid to Owner in cash at Closing (i.e. without purchase money financing). Broker shall use only Owner's standard form contract for sales (the "Sales Contract") of Units, as may be amended from time to time, unless otherwise agreed to by the Owner in writing. Without limiting the generality of Paragraph 7 below, Broker shall not be entitled to any commission with respect to any such Sales Contract which Owner properly refuses to accept in accordance with the provisions hereof. Notwithstanding anything herein to the contrary, and subject to applicable law, Owner shall have the right to reject any proposed Sales Contract for any reason or without reason or arbitrarily and regardless of Owner's guidelines or the extent to which negotiations may have progressed, and no Commission shall be deemed earned by or payable to Broker by Owner with respect thereto. Owner shall make such rejection within the time it is provided for execution of Sales Contracts and provide Broker with written notice of its rejection together with return of the original Sales Contract as executed by the rejected prospective purchaser along with the respective rejected purchaser's undeposited check. Owner shall indemnify and hold Broker harmless for any claims, demands or damages

against Broker relating to or arising from Owner's rejection of a Sales Contract, including Broker's costs and attorney's fees associated with its defense of such claim(s), from receipt of notice of the claim through appeal. Broker shall not be entitled to any commission with respect to any such Sales Contract which Owner refuses to accept in accordance with the provisions hereof

7. **Compensation**. As compensation for the Services rendered to Owner by Broker during the term of this Agreement, the Broker shall be compensated in accordance with the terms and provisions set forth in Exhibit "E" attached hereto.

8. **Information from Owner**. Owner shall provide to Broker with complete and accurate information regarding the Project, including its facilities, amenities, and Units (hereinafter "Owner's Information") as it becomes available to Owner, as same is necessary to Broker's performance of its services. In the event of any updates or amendments to such information, Owner shall provide same to Broker within a reasonable time period.

9. **Co-Brokers**. Whenever Broker knows or has reason to know that a cooperating broker ("Co-Broker") is involved with a prospective purchaser (a "Purchaser") of a Unit, Broker shall cooperate at all times with such Co-Broker pursuant to a commission schedule and standards to be mutually agreed to by the Broker and Owner in writing. Broker hereby acknowledges that it is the Owner's policy to encourage co-broker participation in the sale of Units, and Broker agrees to use its best efforts to facilitate such policy. All Co-Brokers shall be required to furnish proof of proper licensing to the Broker, as applicable, and Owner shall be responsible for any fees and commissions paid said Co-Broker, which fees and/or commissions shall not exceed 3% the Gross Sales Price unless otherwise agreed to by Broker and Owner. Fees and/or commissions to Co-Brokers shall not diminish the compensation to be paid the Broker pursuant to Paragraph 7. Owner approves the Broker's use of the co-brokerage agreement attached hereto as Exhibit "F" (The "Co-Brokerage Agreement"). Any proposed material deviation from the approved attachment shall be submitted to Owner by Broker for approval.

10. **Term**. The term of Services to be provided by Broker pursuant to this Agreement shall commence on May 20, 2005 and shall continue for one year from the date that the first binding purchase and sale agreement with a buyer is executed and delivered by Owner (the "Term"). The Term shall automatically renew for consecutive one-year periods unless either Owner or Broker transmits to the other prior written notice of its intent to terminate this Agreement at least thirty (30) days before the expiration of the then-existing Term.

11. **Covenants, Representations and Warranties of Broker**. Broker covenants, represents and warrants to Owner as follows:

    11.1.   Broker has the power and authority to enter into this Agreement and perform its obligations hereunder.

    11.2.   Broker is duly qualified and licensed as a real estate broker under the provisions of Chapter 475, Florida Statutes, and will so remain throughout the term of this Agreement. All sales representatives, agents, and others employed or retained by Broker in carrying out Broker's duties under this Agreement or performing duties requiring them to be licensed under Florida law, are, or shall be, duly licensed and will so remain throughout the term of this Agreement.

    11.3.   Broker shall, at all times, comply with all federal, state, local and other laws, codes, ordinances, rules and regulations with respect to Broker's services hereunder,

11.4.   Broker and Broker's agents and employees shall not knowingly make any statements, representations or warranties at variance with, or in contravention of, Owner's Documents, as defined herein below, or the Units, and Broker and Broker's agents and employees shall not knowingly make any misrepresentation with respect to the Units or the Project to any prospective or actual Purchaser or any other party.

12. Covenants, Representations and Warranties of Owner. In addition to any other obligations of Owner as set forth in this Agreement, Owner agrees, represents and warrants that:

12.1.   Owner has the power and authority to enter into this Agreement and perform its obligations hereunder.

12.2.   Owner shall provide Broker with the Condominium prospectus and Declaration of Condominium, as well as any sales documents relating to the Condominium, as may be required by Chapter 718, Florida Statutes or any other Federal or state law or regulation upon which the Project is approved ("Owner's Documents").

12.3.   Owner agrees to execute acceptable Sales Contracts within a reasonable period of time from presentation to Owner in order to facilitate and not interfere with Broker's completion of sales which amount of time shall not exceed seven days.

12.4.   Owner shall not interfere with Broker's staff or employees in connection with Broker's administration of its duties under this Agreement, except as may be specifically provided under this Agreement.

13. Brokers Ongoing Business. Owner agrees and acknowledges that Broker is in the business of, among other endeavors, consulting, marketing, developing, owning, brokering, renting, auctioning and/or selling single family homes, apartments and cooperative and condominium units and other property for other owners and developers and agrees and acknowledges that the Broker may continue to do so during the term of this Agreement. Broker's services to Owner are non-exclusive and Broker may render similar or other services to other owners of other properties. However, Broker's agent(s) or employee(s) working on the Project shall work exclusively on the Project and not on any other projects of Broker. Broker shall not use the Sales Center or any portion of the Project to market, advertise or promote any other real property, product or service, nor shall the on-site Project sales personnel or other staff recommend or refer prospective buyers to any such real property, product or service without the prior written consent of Owner, which may be arbitrarily withheld.

14. Insurance. With regard to the Sales Center and the Project, throughout the term of this Agreement Owner shall, at Owner's expense, cause to be issued and keep in full force and effect bodily injury and public liability insurance in an amount not less than $2,000,000.00 combined single limit for personal injury and property damage. Such insurance coverage shall be a company reasonably satisfied to Broker, shall name Owner as the insured and Broker as an additional insured and shall provide that the policy is not cancelable and may not be materially changed until Broker has received at least thirty (30) days prior written notice thereof. Owner and Broker shall be given duplicate copies of all insurance policies containing such coverages or appropriate certificates evidencing such coverages. The Broker shall procure and maintain, at its expense, appropriate Workmen's Compensation insurance coverage for Broker's employees. Any type of insurance or any increases of limits of liability not described herein which Broker requires for its own protection on account of statute shall be its own responsibility and its own expense.

15. Indemnification by Broker. Broker hereby agrees to indemnify, defend and hold harmless Owner (including, without limitation, its members and their officers, directors, agents, and

employees, and their respective assigns, successors and legal representatives) against any and all claims, whether such claims be made by an individual, an entity or governmental body arising from, growing out of or in connection with the Broker's negligence, gross negligence or willful misconduct in performing the Services or obligations of Broker under this Agreement.   Broker further agrees to hold Owner (including, without limitation, its officers, directors, agents and employees, and their respective assigns, successors and legal representatives) harmless from any liability, fines, damages, and expenses including, without limitation, reasonable attorney's fees and costs (including reasonable appellate attorney's fees and costs) whatsoever incurred in defending against any of the above-described claims.

16. <u>Indemnification by Owner.</u>  Owner hereby agrees to indemnify, defend and hold harmless Broker (including, without limitation, its officers, directors, agents and employees, and their respective assigns, successors and legal representatives) against any and all claims, except and to the extent that such claims are based upon Broker's actions or inactions, whether such claims be made by an individual, an entity or governmental body arising from, growing out of or in connection with: Owner's negligence, gross negligence or willful misconduct in performing its obligations under this Agreement; Owner's ownership, development, financing, construction and/or operation of the Project; incidents occurring in or about the Sales Center or the Project, and/or claims or causes of action that may be asserted by the Condominium Association (Homeowner's Association) or any members, thereof.   Owner further agrees to hold Broker (including, without limitation, its officers, directors, agents and employees, and their respective assigns, successors and legal representatives) harmless from any liabilities, fines, damages, and expenses including, without limitation, reasonable attorney's fees and costs (including reasonable appellate attorney's fees and costs) whatsoever incurred in defending against any of the above-described claims.

17. <u>Termination.</u>   Upon any termination of this Agreement as provided herein, Broker shall deliver to Owner copies of all books, customer registrations for the project, records, applications, Sales Contracts, brochures, financial statements and other relevant documents, papers or memorandum used in connection with the Broker's rendering of the Services and a termination of this Agreement shall not relieve either party hereto from fulfilling its financial obligations pursuant to this Agreement.

   17.1.     <u>Automatic Termination.</u>  This Agreement shall automatically terminate upon the closing of the last available Unit.

   17.2.     <u>Termination without cause.</u>  Either party may terminate this Agreement for any reason upon thirty days (30) days written notice to the other party .

   17.3.     <u>Survival of Payment Obligations.</u>  The obligation to pay any and all amounts due hereunder including, but not limited to, the sales commissions, shall survive termination or expiration of this Agreement; provided, however, Owner shall be obligated to pay sales commissions only on the sales contracts which were executed by a Purchaser prior to the termination or expiration of this Agreement.

   17.4.     <u>Termination upon Owner Withdraw.</u>  Notwithstanding anything to the contrary hereinabove, in the event that Owner shall withdraw the Project from the market or the Project shall be otherwise terminated after Broker has commenced performance of the Services, Broker (and each applicable co-broker) shall only be entitled to any draws that have already been paid by Owner.

18. <u>Dispute Resolution.</u>  All claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be settled by discussion between the parties, and failing resolution by such discussions by a competent court of law with proper jurisdiction over the Property, but in any event, not by

arbitration. Without limitation of the foregoing, unless Owner directs otherwise, and regardless of the size or nature of the dispute, Broker shall not cease or delay performance of Broker's services or obligations under this Agreement during the existence of any dispute so long as Broker is paid in accordance with the terms hereof for undisputed services rendered by Broker pursuant hereto. The provisions of this paragraph 18 shall survive the expiration or earlier termination of this Agreement.

19. No Assignment or Transfer of Buyer's Interest. Broker acknowledges and agrees that Owner will not, under any circumstances, consent to the assignment or other transfer of any Purchaser's interest in any Sales Contract, as all such pre-closing assignments violate Owner's obligations to its mortgage lender. The foregoing shall not be deemed to restrict any such Purchaser from re-selling its unit(s) at any time subsequent to the consummation of such Purchaser's closing on its acquisition of such unit(s) from Owner.

20. Trade Names & Trademarks. Owner shall retain all rights to the Project and all related trade names or trademarks; provided, however, that Owner hereby grants a limited license to Broker to use such names in its sale and marketing of the Units, and the term of license shall be automatically terminated upon the expiration or earlier termination of this Agreement.

21. Binding Agreement. This Agreement shall be binding upon Owner and Broker's respective successors and permitted assigns.

22. Modifications. This Agreement may not be modified except by a written amendment duly executed by both parties. No course of dealing between the parties, or change in circumstances, shall be deemed to amend or otherwise vary the terms and conditions of this Agreement.

23. No Personal Liability. None of the members, managers, consultants, agents or employees of Owner or Broker shall be personally liable for the payment of any monies or the performance of any obligations hereunder, or otherwise with respect to this Agreement. Unless otherwise permitted by law, recourse hereunder shall be limited solely to the interest of Owner and/or Broker.

24. Legal Relationships. Broker acknowledges that its legal relationship with Owner is that of an independent contractor and nothing in this Agreement shall be construed as inconsistent with that status. Nothing contained herein and no action taken by Broker in executing its duties under this Agreement shall be deemed to create any contractual relationship between Broker and any Purchaser of any Unit in the Project. Nothing contained in this Agreement shall be deemed to make any third party, including, without limitation, any of Broker's agents or employees, an intended third party beneficiary hereof or give any such party any claim or right of action against Owner stemming from any of the provisions contained herein.

25. Notices. All notices, demands and communications (collectively "Notices") to be given to or by any of the parties hereto shall be deemed to have been properly given is sent either by (1) U.S. Mail and facsimile; or (2) messenger or by national recognized overnight delivery service; and addressed as follows:

    If to Broker:   Philip J. Spiegelman
                    International Sales Group
                    2875 Northeast 191st Street, Second Floor
                    Aventura, Florida  33180
                    Telephone:  (305) 931-6511, Fax:  (305) 931-6558

               And

John Warsing
Turnberry International Realty
2875 NE 191st Street, Suite 600
Aventura, Florida 33180
Telephone: 305

With copy to: Staci Genet Wotherspoon, Esq.
General Counsel
International Sales Group, LLC.
2875 Northeast 191st Street, Second Floor
Aventura, Florida 33180
Telephone: (305) 931-6511, Fax: (305) 931-6558


If to Owner: Jennifer Arons
Centrum Properties, Inc.
500 W. Superior
Chicago, IL 60610
Telephone: (312) 944-7200, Fax: (312) 944-7272


And

Mary Koberstein
Centrum Properties
225 W. Hubbard Street, 4th Floor
Chicago, Illinois 60610
Telephone: (312) 279-2688, Fax: (312) 832-2525

With copy to: James A. Field
Field and Goldberg, LLC
10 South LaSalle Street, Suite 2910
Chicago, Illinois 60603
Telephone: (312) 408-7200, Fax: (312) 408-7201


And

William Bloom
Holland & Knight
701 Brickell Avenue, Suite 3000
Miami, FL, 33131
Telephone: 305-374-8500, Fax: 305-789-7799

Notices shall be sent to such additional persons or other addresses as may be requested in a Notice by any party to the other from time to time. Unless otherwise provided herein, all Notices shall be deemed to have been given when delivered unless delivered by messenger or overnight mail, where same shall be deemed delivered upon receipt or refusal of delivery (vacating of all addresses given above, without forwarding address, shall be deemed refusal of delivery).

26. Non-Waiver. The waiver by either party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any prior or subsequent breach or create any claim of estoppel.

27. Severability. In the event any term or provision of this Agreement be determined by appropriate judicial authority to be illegal or otherwise invalid, such provision shall be given

its nearest legal meaning or be construed as deleted as such authority determines, and the remainder of this Agreement shall be construed to be in full force and effect.

28. Assignability.  Broker shall not be entitled to assign its rights or delegate its duties under this Agreement; provided that the foregoing shall not prohibit Broker from cooperating with another outside broker as provided herein.

29. Attorney's Fees and Jurisdiction.  In the event of any litigation between the parties to this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and court costs.  The parties further mutually agree that:  (i) any litigation brought with respect to this Agreement shall be maintained exclusively in the jurisdiction of Miami-Dade County, Florida; and (ii) any trial shall be before a judge only, the parties mutually waiving any trial by jury.  The provisions of this subparagraph shall survive the expiration or earlier termination of this Agreement co-extensively with other surviving provisions of this Agreement.

30. Counterparts/Effective Date.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and both of which together shall constitute one and the same instrument. The effective date of this Agreement ("the Effective Date") is the date the same is signed by both parties or the date that the last change requiring initialing is initialed by the last party.

31. Construction.   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida. All of the parties to this Agreement have participated fully in the negotiation and preparation hereof, and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto.  In construing this Agreement, the singular shall be held to include the plural; the plural shall be held to include the singular and the use of any gender shall be held to include every other gender.  The caption of the various paragraphs of this Agreement are inserted for the purpose of convenient reference only and shall not affect the construction or interpretation to be given any of the provisions hereof or be deemed in any manner to define, limit, modify or prescribe the scope or intent of this Agreement or any provision hereof.

IN WITNESS WHEREOF, the parties have executed or caused this Agreement to be executed as of the day and year first above written.

(Signatures on Following Page)

**OWNER:**

**MCZ / Centrum Owners Florida III, LLC,**
**A Florida Limited Liability Company**

By: _____
Authorized Representative
Printed Name: _JENNIFER S. ARONS_
Title: _DIRECTOR OF SALES & MARKETING_

**BROKER:**

**TIR SALES AND MARKETING**

By: _____
John Warsing, Managing Member

**And**

**INTERNATIONAL SALES GROUP, LLC**
**a Florida Limited Liability Company**

By: _____
Philip J. Spiegelman, Managing Member

## EXHIBIT "A"

## THE PROJECT

The Project shall consist of 221 residential condominium units, dependent cabanas, garages and parking spaces (collectively, the "Unit" or "Units"), and is currently known as Indigo and is located at 4001 Ocean Drive, City of Hollywood, County of Broward, State of Florida.

## EXHIBIT "B"

### THE SERVICES

Scope of Services.  Broker has provided and shall continue to provide consulting services related to the marketing of the proposed project. In addition, Broker, in conjunction with independent advertising and public relations agencies approved by Owner, shall implement an overall marketing plan and advertising and public relations strategy (the "Marketing Plan") to be approved by Owner for the sales of the Units and Broker shall monitor all efforts pursuant to the Marketing Plan.  In furtherance thereof, the Broker shall perform the following services and fulfill the following functions:

1.  Broker shall prepare the initial Approved Budget and revisions thereof from time to time.

2.  Broker shall monitor consultants retained by Owner in connection with model residence(s) and Sales Center design, furnishing and equipping and advise in the preparation of all advertisements, brochures, news releases, literature, floor plans, descriptions of the Units and all other written and pictorial and audio promotional material relating to the sales of the Units.   The artwork, layouts and text of advertisements, brochures, literature and similar materials are to be prepared by a separate advertising agency retained by Owner, at Owner's direct expense and subject to Owner's approval.  Broker shall consult with and cooperate with all public relations consultants or other consultants employed by Owner.

3.  Broker shall advise and consult with Owner regarding the sales price schedule for Units and any revisions thereof, which sales prices, upon approval by Owner, or as modified by Owner in writing, shall be deemed to be incorporated into this Agreement as Exhibit "D" and shall be the sales prices applicable for the sale of Units by Broker.

4.  Broker shall familiarize outside brokers and sales persons with the Project in order to encourage the sale of the Units, and shall monitor the activities of Broker's network and sales persons.

5.  Broker shall monitor the progress of the sales activity of the Project, shall utilize an agreed upon internet-based inventory management system and provide daily and weekly sales status reports which shall include:   (1) the status of Sales Contracts, including scheduled closings (as such information is provided by Owner, contract contingencies, earnest money deposits, previously closed units, and cooperating brokers' participation; (2) site activity and traffic; (3) and such other information as Owner may reasonably request.

6.  Broker shall recruit, hire, train and supervise the on-site sales staff for the Project, including, without limitation, imparting upon the sales staff depth and knowledge regarding the product and the local market, and shall maintain adequate sales staff at the Sales Center in accordance with Paragraph 3 of this Agreement.

7.  Establish and coordinate an effective procedure of registration, qualification and follow-up for persons visiting or inquiring about Units and for referral of inquiries about the other portions of the Project.

8.  Diligently and courteously coordinate all aspects of the prospective sale, monitor the status of all pending contracts and any contingencies contained therein, transmit all

necessary construction status updates, handle color selections, and advise Owner of the foregoing and any other matter materially affecting the status of a contract or its closing.

9. Comply in all respects with applicable state and local laws and regulations relating to real estate brokerage activities, including without limitation, licensing of sales personnel and filing all forms, reports and returns required of Broker by law. Deliver all any required disclosure documents to buyers (copies of which shall be furnished by Owner) and obtain a written receipt signed by each buyer acknowledging receipt of required disclosure documents, if any.

10. Exercise its best efforts to market the Units within the Project and to the best of its ability meet the sales targets of the Owner.

## EXHIBIT "C"

## APPROVED BUDGET

| Company | Description | Monthly Amount | |
|---|---|---|---|
| **Rental Expense** | | $ 3,000 | TBD |
| **Building Maintenance** | | | |
| Landscaping & Maintenance (Exterior) | | $ - | |
| **Postage Expenses** | | | |
| US Mail | | $ 600 | |
| Express Deliveries (Couriers, Fedex) | | $ 1,000 | |
| **Office Expenses** | | | |
| Office Supplies | | $ 500 | |
| Office Equipment (Computer/Copier/Fax Lease) | | $ 1,300 | TBD |
| Client Refreshments (Coffee, tea, sodas, water, etc.) | | $ 400 | |
| Petty Cash | | $ 200 | |
| Security Alarm | | $ 50 | |
| **Office Maintenance** | | | |
| Plants and Flowers - Interior Decorations | | $ 150 | |
| Janitorial / Cleaning Service | | $ 1,200 | |
| **Utilities** | | | |
| Electricity | | $ 500 | |
| Telephone | | $ 2,000 | |
| Water | | $ 100 | |
| **Monthly Overhead Total :** | | **$ 11,000** | |

| Administrative Salaries | | Monthly Amount | Annual Salary (incl. Benefits) |
|---|---|---|---|
| Receptionist | Full-time | $ 3,025 | $ 36,300 |
| Receptionist | Weekends | $ 3,025 | $ 36,300 |
| Project Administrator | | $ 3,500 | $ 50,820 |
| Marketing Coordinator (6 Months before completion) | | $ 3,529 | $ 42,350 |
| Closing Coordinator | | TBD | |
| **Sub-total Administration :** | | **$ 13,079** | **######** |

**Sales Draws (See Assumptions on Marketing Budget)**
*All draws include benefits*

| | | Monthly Amount | |
|---|---|---|---|
| Sales Director | | $ 10,000 | |
| Sales Person #1 | | $ 4,000 | |
| Sales Person # 2 | | $ 4,000 | |
| Sales Person #3 | | $ 4,000 | |
| ISG/ TIR | | $ 15,000 | |
| **Sub-total Sales Draws :** | | **$ 37,000** | |
| **Monthly Salary/Draw Total :** | | **$ 50,079** | |

**EXHIBIT "D"**

**PRICE LIST**

## EXHIBIT "E"

### BROKER'S COMMISSION SCHEDULE

A. As of the Effective Date of this Agreement, Broker shall be entitled to and Owner agrees to pay to Broker monthly, a draw against future commissions in the amount set forth on the Approved Budget. Said Draw shall be due with invoice on the first of each month.

B. The sales commissions to be paid by Owner to Broker on approved sales of Units shall be at the rate of:

        2.75% for sales without Co-Brokers;

        2.75% for sales through Florida Co-Brokers;

        2.75% for sales through Out of State, Domestic Co-Brokers (in the event Owner approves marketing to or though such Brokers), and,

        3.5% for sale through International Co-Brokers (in the event Owner approves marketing to or though such Brokers),

of the gross sales price of each applicable Unit for which Broker is eligible for a commission. The term "gross sales price" includes addendum upgrades and means the actual Purchase Price paid in full by each purchaser pursuant to an executed and consummated Sales Contract, less any credits given by Owner.

C. The sales commissions shall be deemed earned by Broker as set forth in Paragraph E herein below. Notwithstanding, payment of the commission shall be as follows:

    1. 30% of the total commissions (the "Initial Commission Payment") shall, subject to paragraph C.3 herein below, be payable upon (i) execution of Sales Contract; and (ii) collection and clearance of an earnest money deposit not less than ten percent (10%) of the gross sales price; and (iii) expiration of all rescission periods and satisfaction of all conditions precedent to the Purchaser's obligation to close;

    2. 70% of the total commissions shall, subject to paragraph C.3 herein below, be payable upon closing and transfer of title to each Unit. The sale of a Unit shall be deemed to have closed when title to the Unit is delivered to the Purchaser and the Owner has received, in cleared funds, the gross sales price therefore.

    3. The payment of the portions of the earned sales commissions set forth in C.1 shall be net of draws and within thirty (30) days of invoice to Owner which invoice shall be made no earlier than the month following the month when the conditions for payment of the commission advance have been satisfied, expired and/or waived. (for example the commissions which become payable in April 2005 shall be invoiced in May 2005). The payment due Broker pursuant to C.2 above shall be recognized on the settlement closing statement and disbursed to Broker by the closing agent from the closing proceeds.

D. In the event of an uncured Purchaser Default, including a failure to make deposits due or failure to close and regardless of whether Owner retains any deposits in connection with said transaction, Broker shall not be entitled to any commission for said transaction nor be entitled to receive any portion of the retained deposits and Broker shall provide Owner with a credit against future commissions due to Broker hereunder in the full amount of the commission paid by Owner for said defaulted transaction, or, if no future commissions are due, Broker shall return any commissions paid for such defaulted transaction. In the event

that Owner determines to cancel a Sales Contract for which Broker has earned a commission, Owner shall provide at least seven (7) days Notice to Broker of its intent to cancel such Sales Contract and provided such determination is reasonable, such commission shall be deemed unearned and shall not due to Broker.

E.  A Unit shall be deemed contracted for and Broker shall have earned a commission on those Units for which, during the term of this Agreement: (i) a Sales Contract, therefore, (on Owner's form) has been fully and properly executed by a Purchaser and Owner; (ii) an earnest money deposit(s) equal to not less than the ten percent (10%) of the Purchase Price has been paid by such Purchaser and received by Owner and has cleared; (iii) all conditions precedent to such Purchaser's obligations to Close, including without limitation, qualification for financing, if applicable, have been satisfied in full or waived; and (iv) the rescission period provided for by law and commencing on the date of the Sales Contract has expired;

F.  The sales commission to be paid by Owner to Cooperating Brokers, through Broker, on approved sales of Units shall be at pre-approved percentage of the Gross Sales Price of each applicable Unit for which Cooperating Broker is eligible for a commission pursuant to the terms of executed Co-Brokerage Agreement (Exhibit "F").. The rate of commissions to Cooperating Brokers shall be approved by Owner prior to offering the Units for reservation or sale to the Public or Broker community. Co-brokerage Commissions shall paid to Broker in accordance with the terms of the respective applicable executed Co-brokerage Agreement, which shall be in substantially the same form at that attached as Exhibit F to the Agreement. Broker shall disburse such Co-Brokerage Commissions and, upon payment by Broker, obtain a Release from Cooperating Broker in favor of Broker and Owner for the amount of said payment.

G.  Closings.  Owner shall advise Broker, on a weekly basis of the status of the closings, and the closing schedule.

## EXHIBIT "F"

## CO-BROKERS AGREEMENT

**PROJECT:**   INDIGO  BEACH  RESORT & RESIDENCES          **UNIT NO:** _____

**PURCHASER:** _____

**CO-OPERATING BROKERAGE COMPANY:**_____
("Outside Broker")
**CO-OPERATING SALES AGENT** *(print name)*_____
("Outside Sales Agent")

International Sales Group, LLC, ("ISG" or "Listing Broker"),   Outside Broker and Outside Sales
Agent, agree as follows as to the purchase of Unit _____ of    the   Project   (the   "Unit"),
developed by MCZ / CENTRUM OWNERS FLORIDA III, LLC, a Florida Limited Liability
Company ("Owner") by _____
_____("Purchaser"):

1.  Based upon Outside Broker and/or Outside Sales Agent's registration of Purchaser for the
    above-referenced Unit within the past ninety days and involvement as participating broker /
    agent in connection with the above real estate transaction, Outside Broker shall be entitled
    to a total commission for the sale of the Unit to Purchaser at the rate of 3% of the total Unit
    Price as set forth in the Sales Contract as executed by Purchaser and Owner, earned due
    and payable at closing.    Subject to paragraph 2 hereinbelow:

    a.  30% of the total commission will be advanced by the end of the calendar month
        following the month of Owner receives clear funds representing all deposits required
        under a fully executed Sales Contract, which and all contingencies to Purchaser's
        obligation to close have been removed and the deposit is non-refundable;

    b.  70% of the commission will be payable at the closing of the transaction.

2.  All commissions will be paid as specified when funded by the Owner.  In the event that the
    Owner shall be lawfully required to return the deposit to the Purchaser then the Broker shall
    be obligated to return the commission to the Owner.  An opinion by Owner's counsel that
    Owner is obligated to return the deposit to the Purchaser will be conclusive proof of Owner's
    obligation in this respect, providing only that Owner does make that refund.

3.  **OTHER SALES TRANSACTIONS.** This agreement does not obligate Listing Broker to pay
    commissions to Outside Broker for any prospective purchaser at the Project other than
    Purchaser for the Unit.  Such an obligation may only be pursuant to a written agreement in a
    form acceptable to Listing Broker in its sole discretion.  Listing Broker reserves the right in its
    sole and absolute discretion to modify the terms under which it agrees to pay Outside
    Broker commissions.  Neither Outside Broker nor Outside Salesperson may rely upon the
    terms of this agreement for any transaction other than the one specifically involving the
    Purchaser during the effective term of this registration.  This agreement does not obligate
    Listing Broker to pay commissions to Outside Broker in the event Purchaser purchases a
    condominium in (the "Project") which has been previously sold (i.e., a "resale") or is not
    listed with Listing Broker.

4.  **INDEMNIFICATION.** Outside Broker and Outside Salesperson jointly and severally agree to
    indemnify and hold Listing Broker harmless from and against any and all losses, claims,
    demands, damages, costs and expenses of whatever nature or kind including reasonable
    attorneys' fees and costs and appellate fees and costs relating to or arising out of any

claims against Listing Broker as a result of any representation or other conduct by either of them which are made or done without the express written consent of listing Broker.

5. **NO INDUCEMENTS.** Neither Outside Broker or Outside Salesperson shall pay or offer to any person a referral fee, rebate, bonus gratuity, commission or other form of compensation or consideration, for the purchase by Purchaser of a condominium at (the "Project"), without the prior written consent of the Owner and the Listing Broker.

6. **CONFIDENTIALITY.** The registration forms, mailing lists, purchaser lists and other records of prospective or actual purchasers are proprietary to Listing Broker and are confidential trade secrets. Outside Broker and Outside Salesperson are not entitled to review the contents of any of the foregoing. Outside Broker and Outside Salesperson agree not to enter into any negotiations directly or indirectly with any Unit Owner at the Project or prospective Purchaser deemed registered to Listing Broker regarding the reservation, purchase, lease and or option of the Project, except with the direct participation or express prior written approval of Listing Broker.

7. **ATTORNEYS' FEES AND COSTS.** In the event of any litigation arising from this Agreement, the prevailing party shall be entitled to reimbursement from the other party of all reasonable attorneys' fees and cost associated with such matter at the pretrial, trial and appellate levels.

8. **COMPLIANCE WITH LAWS AND RULES.** Outside Broker and Outside Salesperson agree to comply, abide and be bound by all laws, rules, regulations and codes of ethics promulgated or adopted by any state or local authority or board realtors regulating the conduct of real estate brokers and salespersons and the payment of real estate commissions. In addition, Outside Broker and Outside Salesperson shall not interfere with ISG's employee's performance or duty of loyalty to ISG and/or the Owner. Further, and unless Outside Broker and Outside Salesperson notify Listing Broker in writing of their respective exclusion from the requirement for such licensure upon execution of this Agreement, Outside Salesperson and Outside Broker represent and warrant that they their respective Florida Real Estate Licenses are current and in good standing and that they will maintain such status at all times material to this Agreement.

9. **RELEASE:** Simultaneously with delivery of the amount(s) provided for in paragraph 1.a., Outside Broker and Outside Salesperson shall provide Listing Broker with a Partial General Release in favor of Owner and Listing Broker as to the amount(s) delivered. Simultaneously with the delivery of the amount provided for in paragraph 1.b., Outside Broker and Outside Salesperson shall provide Broker with a Full General Release in favor of the Owner of the Project and Listing Broker as to all amounts due under and obligations arising from this Agreement. The Release provided for herein shall be on a form prepared by and acceptable to Broker within its sole discretion.

10. **DEFAULT BY OUTSIDE BROKER.** If either Outside Broker or the Outside Salesperson violates any of the terms or conditions of this agreement or fails to fully and completely participate as needed throughout the transaction giving rise to the commission set forth herein, Listing Broker shall have the right, in its sole and absolute discretion to do any one or more of the following:

    a. Not pay any commission to Outside Broker or Outside Salesperson for any transaction involving the Purchaser;

    b. Not pay any commission to Outside Broker or Outside Salesperson for any other transaction(s) (whether involving a Purchaser or not) in which Outside Broker is an Outside Broker; and,

   c. Refuse to recognize Outside Broker and Outside Salesperson as an outside broker for any future transactions (whether involving the Purchaser or not) in which the Listing Broker is involved.

11. **EXECUTION BY OUTSIDE BROKER AND OUTSIDE SALESPERSON.** The execution of this agreement by Outside Salesperson shall be deemed to bind both the Outside Salesperson and the Outside Broker to the terms and conditions hereof. Notwithstanding, this Agreement is not enforceable by Outside Broker or Outside Salesperson unless executed by both Listing Broker and Outside Broker.

12. **REJECTION OF SALE BY OWNER.** In the event that Owner, it its sole discretion, rejects the sale to Purchaser, no commission shall be due to Outside Salesperson or Outside Broker.

13. Outside Salesperson acknowledges that s/he registered Purchaser's name with the Project on behalf of Outside Broker. By registering Purchaser's name on the form and by executing a copy of same, Outside Salesperson on behalf of itself and the Outside Broker acknowledges that he/she has read the terms and conditions of the Outside Broker Commission Agreement contained herein and agrees to abide and be bound thereby.

14. **ENTIRE AGREEMENT.** This Agreement sets for the entire agreement between Listing Broker and Outside Salesperson and shall not be altered, modified or amended, unless in writing and signed by all the parties hereto.

**LISTING BROKER:**                     **CO-OPERATING BROKER:**

INTERNATIONAL SALES GROUP, LLC,
a Florida Limited Liability Company

BY:_____        BY:_____
Authorized Agent                 Co-Operating (Outside) Broker's Signature
Date:_____     Licensed Real Estate Broker
                                 Printed Name: _____
OR                             Title: _____
                                 Date: _____

TIR SALES AND MARKETING

BY:_____        Co-operating (Outside) Sales Associate
Authorized Agent                 Licensed Real Estate Agent
Date:_____     Printed Name:_____
                                 Date:_____



February 16, 2006

<u>*Via Facsimile and U.S. Mail*</u>

Mr. Philip J. Spiegelman
International Sales Group
2875 Northeast 191ˢᵗ Street, Second Floor
Aventura, Florida  33180
Fax: (305) 931-6558

Mr. John Warsing
Turnberry International Realty
2875 NE 191ˢᵗ Street, Suite 600
Aventura, Florida 33180
Fax: (305) 935-9092

Re:    Brokerage Services for the Parc Central

Gentlemen:

MCZ/Centrum Florida XVIII, L.L.C. ("Owner") is the owner of the property located at 3300 NE 191ˢᵗ Street, Aventura, Florida and commonly known as the Parc Central, formerly known as the Bay Club (the "Property").

This letter shall serve as notice to International Sales Group ("ISG") and Turnberry International Realty ("Turnberry") that effective as of the date hereof, Owner hereby terminates the brokerage services of ISG and Turnberry in connection with the Property. Therefore, ISG and Turnberry should immediately terminate all activities in connection with the Property and vacate the Property.

Very truly yours,

MCZ/CENTRUM FLORIDA XVIII, L.L.C.

*Michael Lerner*

cc:    Staci Genet Wotherspoon, International Sales Group (via facsimile, 305-931-6511 and U.S. mail, 2875 Northeast 191ˢᵗ Street, Second Floor, Aventura, FL 33180); and

Elizabeth D. Jensen, Field and Goldberg, LLC (via facsimile, 312-408-7201)

EXHIBIT
"2"

July 17, 2006

**Via Messenger**

Mr. Philip J. Spiegelman
International Sales Group
2875 Northeast 191ˢᵗ Street, Second Floor
Aventura, Florida   33180

Mr. John Warsing
Turnberry International Realty
2875 NE 191ˢᵗ Street, Suite 600
Aventura, Florida 33180

      Re:   Brokerage Services for the Sian, formerly known as the Indigo

Gentlemen:

      MCZ/Centrum Owners Florida III, LLC ("Owner") is the owner of the property located at 4001 Ocean Drive, Hollywood, Florida and commonly known as the Sian, formerly known as the Indigo (the "Property").

      This letter shall serve as notice to International Sales Group ("ISG") and Turnberry International Realty ("Turnberry"), pursuant to Section 17.2 of that certain Brokerage Agreement by and among Owner, ISG and Turnberry in connection with the Property (the "Agreement"), that Owner hereby terminates the Agreement.  Therefore, effective August 16, 2006 (30 days after the date hereof) or sooner, as agreed upon by ISG, Turnberry and Owner, ISG and Turnberry shall terminate all activities in connection with the Property and vacate the Property.

      Pursuant to Section 17 of the Agreement, upon termination of the Agreement, ISG and Turnberry shall deliver to Owner copies of all books, customer registrations for the Property, records, applications, sales contracts, brochures, financial statements and other relevant documents, papers or memorandum used in connection with ISG's or Turnberry's rendering of brokerage services.

      Very truly yours,

      MCZ/CENTRUM FLORIDA XVIII, L.L.C.

cc:   Staci Genet Wotherspoon, International Sales Group (via messenger, 2875 Northeast 191ˢᵗ Street, Second Floor, Aventura, FL 33180); and
      Elizabeth D. Jensen, Field and Goldberg, LLC (via facsimile, 312-408-7201)

EXHIBIT

" 3 "

# CIVIL COVER SHEET

JS 44 (Rev. 11/05)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)  **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

International Sales Group, LLC and J.O.S. Realty Co. d/b/a TIR Sales and Marketing

**DEFENDANTS**

MCZ/Centrum Florida III Owner, LLC and MCZ/Centrum Florida XVIII, LLC

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Cook County, Illinois
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Buchbinder & Elegant, P.A. - Harris J. Buchbinder, Esq.
46 S.W. First Street, Fourth Floor, Miami, FL 33130
305-358-1515

Attorneys (If Known)

Holland + Knight LLP - James Wing, Esq./Robert Watson, Esq.
701 Brickell Ave., Suite 3000, Miami, FL 33131 305-374-8500

CIV - KING

MAGISTRATE JUDGE
GARBER

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☑ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☑ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☑ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):
a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☐ YES ☑ NO

JUDGE _____    DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

28 U.S.C. 1332 and 1441 (diversity jurisdiction); breach of contract and other state-law claims

LENGTH OF TRIAL via 3 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ $5,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  September 27, 2006

FOR OFFICE USE ONLY

AMOUNT _____    RECEIPT # 947388