UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-22438-CIV-KING

INTERNATIONAL SALES GROUP, LLC and
J.O.S. REALTY CO.
d/b/a TIR SALES AND MARKETING,

    Plaintiffs,

vs.

MCZ / CENTRUM FLORIDA III OWNER, LLC
MCZ / CENTRUM FLORIDA XVIII, LLC, and
MCZ / CENTRUM FLORIDA VI OWNER, LLC,

    Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This proceeding is before the Court upon Counts II and IV of the Amended Complaint of plaintiffs as they pertain to the property known as Sian II only and the answer in respect thereto. The affirmative defenses were withdrawn prior to trial and plaintiffs voluntarily dismissed Count IV of their Amended Complaint at the beginning of trial.

This case has been simplified since its inception. Initially, this case and a companion case involved four separate condominium conversion projects in three different cities (Parc Central in Aventura, Somerset near Orlando, and Sian I and II in Hollywood). The parties have settled their disputes as to three of the four projects. Just prior to trial, the parties also settled their dispute as to unit purchasers at Sian II who were transferred to Flamingo and Parc Central. The only remaining project at issue in this case is the Sian II project.

<u>The Issues</u>   Defendant MCZ paid the plaintiffs $391,000 in advance brokerage commissions before the closing of any Sian II units and before the Sian II project had been

converted to a condominium. This amount represents approximately 30 percent of the total commissions that plaintiffs claim. As to this amount, plaintiffs claim that they are entitled to $345,000 presently held in escrow. The term "draws" as used herein refers to the periodic monthly disbursements that MCZ made to the plaintiffs for their expenses in operating the sales office from which the brokers performed their services. MCZ does not seek any recovery for these expenses. They are separate and distinct from the $391,000 in advance commissions that MCZ paid.

Plaintiffs also claim that they are entitled to an additional $980,631, representing the remaining 70 percent balance of the commissions plaintiffs claim are due in respect to Sian II. Plaintiffs seek these commissions on the theory that there is an implied-in-fact contract between the parties whereby the plaintiffs were to be paid commissions of 2.75 percent of all sales.

The defendant, MCZ, agrees that an implied-in-fact contract exists but that its terms are identical to the contract expressly referable to Sian I, including paragraph 17.4 thereof which reads:

> Termination upon owner withdrawal. Notwithstanding anything to the contrary hereinabove, in the event the owner shall withdraw the project from the market or the project shall be otherwise terminated after the broker has commenced performance of the services, broker (and each applicable co-broker) shall only be entitled to any draws that have already been paid by owner.

The issue then is whether there exists an implied-in-fact contract between the parties for Sian II containing terms identical to the contract executed by and between the parties in or around July 2005 for the property known as Sian I. The parties have stipulated that the issues of fact which remain to be litigated are (1) whether paragraph 17.4 of the Sian I agreement applies to the Sian II project and (2) if paragraph 17.4 applies to the Sian II project, did MCZ's withdrawal of Sian II from the market excuse MCZ from paying the commissions. The Court

finds that the term "commissions" refers to the commission of which thirty percent had already been paid to the plaintiffs with the balance due after separate condominium units had been sold to unit buyers. The parties have also stipulated (a) that the plaintiff provided services to MCZ for the Sian II project; (b) the parties entered into the written brokerage agreement annexed as Exhibit 1 to the Complaint which has been marked as Plaintiff's Exhibit 1 in this case which agreement specifically refers to the property known as Sian I; and (c) that MCZ paid the plaintiffs advance commissions equal to approximately 30 percent of the total commission that might be due in the amount of $391,000; and (d) should the plaintiffs prevail under their claim for the remaining 70 percent of the commissions, they will be entitled to $980,631.

<u>Jurisdiction</u> The Court finds that it has jurisdiction of this matter under 28 USC §1332.

<u>Credibility of Witnesses</u> Six witnesses testified in this case. The Court finds that all six were good people who appeared and testified to the best of their recollection from the events that occurred with reference to the sale of the units in Sian I and Sian II. The Court found no substantial conflict or anything that would impeach the general credibility of any of the witnesses. While there may be some minor differences on some matters, the witnesses who testified with respect to the facts of this case did so honestly and properly on both sides. Some of these witnesses expressed lay opinions as to what they believed or what they thought they were doing. These opinions are not part of the Court's findings of fact to the extent that the Court can separate them from facts. The Court makes findings only of facts and disregards opinions of the witnesses as to their interpretations of plaintiffs' Exhibit 1, the brokerage contract, as it applies as a contract implied-in-fact.

## **FINDINGS OF FACT**

The Court makes the following findings of fact predicated upon the testimony of the following witnesses:

Cassandra Palanza

1. The Plaintiff had performed services for four properties owned by MCZ: Sian I, Sian II, Somerset and Parc Central. There were agreements between MCZ and ISG as to some of these properties, but not all of them. Each project except Sian I and II had its own separate sales office whereas Sian I and II had the same sales office located on the ground floor of Sian I. This sales office had been configured by the defendant and the plaintiffs working together to contain a scale model of both the Sian I and Sian II projects and all the information as to both projects. They were marketed from the same location.

2. Ms. Palanza was responsible for the payments to the brokers. Administrative expenses that MCZ paid were non-refundable to MCZ. Draws were to be advanced against commissions and then set off against commissions that were earned. Ms. Palanza actually made these payments.

3. The commission on Sian II was 2.75 percent, and Ms. Palanza paid 30 percent of these commissions on Sian II in advance in the same manner as she had made payments on Sian I. Exhibit 23 is an overall data sheet on Sian II reflecting payments.

4. The boom and glory days of real estate sales of these types of projects in the Dade County and Miami Beach area occurred during 2003, 2004 and 2005. Ms. Palanza characterized as "insanity" what was going on in 2003 and 2004 with people fighting to buy apartments, sales coming in faster than they could be controlled, and people lining up around buildings to buy units. In September of 2005, sales began to drop off. Fifty-four units of Sian II

sold in September 2005, 89 in October 2005, 16 units in November and 16 units in December 2005. In January of 2006, sales dropped to 6 units followed by 2 units in February and 1 unit in March.

5. A termination letter went out to ISG in July of 2006, and a new brokerage company was hired that attempted to sell units. Ms. Palanza was the onsite contract administrator working with all the unit buyers and with everyone she could to help as best as she could to procure financing for them.

6. Lenders came to the project to work with the people who were attempting to get credit to buy the units. They came to the Sian I premises and she worked with them.

7. In Plaintiffs' Exhibits 41 and 48 dated August 2 and August 29, 2007, MCZ notified the unit purchasers that they were terminating their contracts. Defendant's Exhibit 15 is a summary of the units in Sian II in respect to which deposits were refunded and contracts cancelled. This exhibit shows that there were 170 refunds, 22 transfers of buyers from Sian II to other projects and approximately 17 units where refunded deposits remain unclaimed and are the subject of threatened lawsuits.

Philip Spiegelman

8. Both the Somerset project and Sian II were ultimately removed from the market, and in neither case was there an agreement for draws to pay expenses or a budget. Neither were there budgets on any of the other ISG/MCZ projects except Sian I. On Sian II, 30 percent of the commissions due on sales contracts were paid. The Somerset and Parc Central projects had separate sales offices. On Sian I there was a budget for draws and the amount was $50,079 per month. Draws were to be paid back when commissions were earned and MCZ paid commissions on Sian I in excess of the monthly draws. He testified "I was never paid draws on

5

Sian I. But commissions were paid." The Court concludes from the above testimony that commissions took care of draws and that the commissions were coming in rapidly on Sian I and that those commissions were in excess of the $50,000 per month in draws that had been agreed to on Sian I.

### Staci Genet-Wotherspoon

9. Staci Genet-Wotherspoon was the in-house counsel for ISG and worked on the draft documents leading up to and culminating in Defendant's Exhibit 1. She testified that the Exhibit 1 contract derived from a form used by ISG. The Court finds that Mr. Spiegelman did not like or would not have chosen to put paragraph 17.4 into the document but, ultimately, the provision is in the document and he did agree to it.

### Michelle Rine

10. Michelle Rine spent a great deal of time at the sales office which jointly marketed both Sian I and Sian II. She gave a general insight as to what was happening with unit buyers who were resisting completing the contracts they had entered into. The Court finds her testimony to be a fair summary of the atmosphere at the project in late 2006 and early 2007. The bottom had fallen out of the market at that point and there were numerous complaints, objections and other events happening that suggested that there was going to be a massive collapse of the unit buyers' original announced intent to close on units as to which signed contracts had been entered into.

### Donald Alexander

11. Donald Alexander gave interesting testimony as to the "glory days" where sellers of condominium units ran lotteries to allocate units among buyers and were helping out people who were sleeping outside of the sales office waiting to buy them. He testified that in those days

when units were put up for sale, units could be sold and closed within thirty to forty-five days. The market was strong. The Court so finds.

Arthur Slaven

12. Arthur Slaven of MCZ traced the history of both Sian I and II and gave a word picture of their physical location, the development plans and what it intended to do with the development. This testimony was without conflict. ISG began selling Sian II in the Fall of 2005; there was never an executed separate contract on Sian II; ISG was authorized to sell units on Sian II; ISG occupied the same sales office for both Sian I and II on the first floor of Sian I; most of the personnel was the same; that there was a $50,000 per month budget for expenses on Sian I (of which $37,000 was to be advanced as draws to sales people until they started receiving sales commissions, and $13,079 for administrative expenses); MCZ was obligated to pay those draws and did pay them through commissions; and no separate budget was ever entered into in respect to Sian II. ISG never requested any separate payments on Sian II for its expenses, and MCZ in fact did carry out its obligation to pay 2.75 percent commissions on Sian II insofar as 30 percent of the commissions was advanced to ISG when contracts went hard.

13. The Court finds that the parties participated on Sian II on the same basis that they did on Sian I as reflected in the written contract of July 2005. The Court finds that an implied-in-fact contract for Sian II did arise through the actions of the parties. MCZ's contract with ISG simply "slopped over" to cover Sian II and sales proceeded there under the same terms as Sian I.

14. The financing bank for MCZ required that by June of 2007 there had to be 189 "hard" contracts in place with 90 units closed through a "mass closing." Absent compliance with those conditions, the lenders did not have to agree to go forward with the closing on any condo units, and this was a requirement that MCZ had to meet. MCZ could not in fact close on the

condo units unless it had first met this requirement. MCZ did what it could do to meet the requirements and, as a prudent developer, checked comparable sales valuations on other units, lowered prices on Sian II by 10 to 15 percent, instructed that unit buyers be called to see if they intended to close or not and received reports which lead it to believe that many of them were not going to close and were not going to fulfill their contractual duties.

15.     Mr. Slaven brought these facts to the attention of his lending banks, attempted to induce the management of the Sian II hotel to agree to buy 100 units as reflected in Defendant's Exhibit 58 and Plaintiffs' Exhibit 51 and then ultimately sold the hotel to this management company for $74 million, a gross amount $10 to $15 million less than if the project had gone forward and had been sold out as initially contemplated.

16.     MCZ did everything it could to make the conversion happen and satisfy its lenders but was unable to do so. MCZ then notified the unit owners that the contracts were cancelled and refunded their money and closed the project down as far as selling converted condos was concerned.

## CONCLUSIONS OF LAW

17.     Paragraph 17.4 of the Sian I agreement applies to the Sian II project.

18.     Paragraph 17.4 excuses MCZ from paying the claimed commissions. The Plaintiffs' claim for $980,631 has not been proven.

19.     An implied-in-fact contract exists in respect to Sian II and all of the provisions of the Sian I contract apply to the Sian II project, not just some of the provisions.

20.     It was clearly understood by all parties that if the owner withdrew the project from the market or it was otherwise terminated even after services had been performed, the parties were limited to whatever they had provided for in their contract. The plaintiffs are not

to be paid anything.

## CONCLUSION

Based upon the foregoing, it ORDERED AND ADJUDGED that the Plaintiffs, International Sales Group, LLC and J.O.S. Realty Co. d/b/a TIR Sales and Marketing, shall take nothing by this action and shall go hence without day. The Court reserves jurisdiction to enter a separate judgment for costs and attorney's fees to the defendant as prevailing party and to enforce the parties' settlement agreement as to the transferred units.

DONE AND ORDERED in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida this 14th day of March, 2008.

_____
JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

Conformed Copies to:
James D. Wing, Esq.
Harris J. Buchbinder, Esq.

# 5161076 v2